HARTLEY C. WHITE,

                Plaintiff,

    - versus -

ANDY FRAIN SERVICES, INC.,

                Defendant.

MEMORANDUM AND ORDER
12-CV-5868 (JG) (VVP)

A P P E A R A N C E S:

    HARTLEY C. WHITE
        34-35 100th St., Apt. 2(e)
        Corona NY, 11368
        *Pro Se Plaintiff*

    LITTLER MENDELSON, P.C.
        290 Broadhollow Road, Suite 305
        Melville, NY 11745
    By:    John T. Bauer
        Justin R. Marino
        *Attorneys for Defendants*

JOHN GLEESON, United States District Judge:

        Hartley C. White alleges in this *pro se* action that his former employer, Andy Frain Services, Inc., a security company, discriminated against him on the basis of his race, religion, national origin, age, sex, and color, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*, the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621 *et seq.*, the Equal Pay Act ("EPA"), 29 U.S.C. §§ 206(d) *et seq.*, and various provisions of the New York State Human Rights Law ("NYSHRL") and New York City Human Rights Law ("NYCHRL"). White claims that several of his supervisors at Andy Frain discriminatorily failed to promote him, provided him unequal terms and conditions

of employment, retaliated against him for engaging in protected activity, and otherwise harassed, threatened, and discriminated against him. The defendant has moved for summary judgment. For the reasons set forth below, the motion is granted in its entirety.

BACKGROUND

A. *Factual Background*

The following facts are taken from the parties' Local Rule 56.1 statements, affidavits, deposition excerpts, and other documentary evidence submitted by the parties. The facts set forth below are either not in dispute or – to the extent they are disputed – are White's version of the events, and I construe all facts in the light most favorable to him.

White is a 58-year-old black Jewish man born in Jamaica. Marino Decl. Ex. 1, Compl., at 4. White worked full-time for Andy Frain as a licensed security and fire guard at the Billie Jean King National Tennis Center (the "BJKNTC") in Queens from December 2008, when Andy Frain won the contract to provide security there, to March 2012, when Andy Frain lost the contract. Def. Rule 56.1 Statement ¶¶ 1, 4, 8. Between 2004 or 2005 and 2008, before White worked for Andy Frain, he worked full-time for Summit Security as a fire guard and supervisor of the fire command station at BJKNTC. *Id.* ¶ 3. When Andy Frain lost the BJKNTC contract to Apollo Security in March 2012, White was immediately hired by Apollo Security for the same position he had held with defendant, and he continues in that position today. *Id.* ¶¶ 8-9, 12.

Starting in March 2010, White served as a supervisor at the BJKNTC fire command station for Andy Frain. White Rule 56.1 Response ¶ 5. In addition to serving as a security and fire guard, his duties as a supervisor included writing memos concerning Andy Frain employees' workplace, training, and security policies, and requesting office supplies, uniforms, and handbooks as needed for the BJKNTC station. *Id.* ¶ 6. White also had a limited

2

role in scheduling Andy Frain employees to work at the BJKNTC station, mainly advising his supervisors on who should work which shifts and commenting on the schedule, but he was not responsible for making scheduling decisions. *Id.* ¶ 7; Marino Decl. Ex. 2, White Dep. 79:18-80:5.

      1. *Vacation Requests and Compensation*

White claims that he had various problems getting vacation time approved by his supervisors and getting paid promptly for his approved vacation days. Marino Decl. Ex. 1, Compl., at 6. He requested a week of paid vacation during Passover in 2010, but the request was denied. Marino Decl. Ex. 2, White Dep. 170:7-173:19. White did take a week of paid vacation in 2010, but he thinks it was sometime after the Passover holiday. Def. Rule 56.1 Statement ¶ 23. Similarly, in the spring of 2011, White requested to take the week of Passover off, but instead was given a week of vacation in May, after the holiday. *Id.* ¶ 24. White did not receive his salary for the vacation he took in May 2011 until June 6, 2011, after complaining about the delayed compensation a few days earlier. Marino Decl. Ex. 2, White Dep. 107:18-109:21.

White also submitted a request to Dane DeSouza, one of his immediate supervisors, to take several days off to observe Jewish religious holidays in September 2011. Marino Decl. Ex. 3, White Dep. 347:10-349:7. White does not recall if DeSouza approved the request or not, but he does remember that he took the days off, either as vacation days or by arranging for other employees to cover his shifts. *Id.* 349:5-8. White also claims that other Andy Frain employees were paid for their vacation time in advance, but that he was paid after his time off in 2010 and 2011. Def. Rule 56.1 Statement ¶¶ 27-28. In 2012, White requested his vacation pay in advance and received it. Marino Decl. Ex. 3, White Dep. 344:10-22. He did not request any vacation days from Andy Frain in 2012. *Id.* 345:3-7.

2. *Working Extra Shifts*

White also claims that on 20 to 30 occasions over the course of his employment with Andy Frain he was required to work a 16-hour double shift because the employee scheduled to take the next shift failed to show up and White's supervisors were unable to find a replacement. Def. Rule 56.1 Statement ¶¶ 83-84. White admits that other Andy Frain employees were similarly expected to work a double shift if their replacement did not show up as scheduled. *Id.* ¶ 85. On several occasions White was told by DeSouza that if he left his post and did not cover the shift of the employee who failed to show up he would be fired. Marino Decl. Ex. 2, White Dep. 163:4-8, 259:17-23. According to White, the rule that if a security or fire guard leaves the post unattended they will be fired was a "general order of the post," applicable to all employees, but he does not believe that other employees were specifically threatened by DeSouza that they would be fired if they left their post without a replacement. *Id.* 166:2-7, 259:24-260:12.

3. *Underpayment*

White alleges that while he worked for Andy Frain his paychecks were often incorrect, and that he was underpaid by a number of hours in many pay periods. *Id.* 264:16-20. White would occasionally check his pay stubs against the sign-in sheets to determine if he had been paid for all the hours he had worked in a pay period. *Id.* 247:6-10. If he found a discrepancy he would raise it with a supervisor, who would sometimes resolve the issue. *Id.* 268:21-269:4. White believes, however, that he is still owed at least $73.31 in unpaid wages. *Id.* 246:23-247:2.

4. *Scheduling Duties*

White alleges that in April or May of 2011 DeSouza would no longer accept his input on making the schedule. Marino Decl. Ex. 2, White Dep. 140:21-141:19. White claims that Emeris Lacen, a non-supervisor, did the scheduling from May 2011 until October or November 2011. *Id.* 141:8-142:3. This period coincided with an accusation against White that he was influencing the schedules in favor of another employee, Deidre Johnson. *Id.* 141:20-24.

5. *Request for a Raise*

White claims that in March 2010 Paul Dupuis, a vice president of Andy Frain, promised White a raise that he never received. Marino Decl. Ex. 3, White Dep. 390:15-18. On April 6, 2011, White sent an email to DeSouza requesting a raise for all Andy Frain employees working at the fire command station. Def. Rule 56.1 Statement ¶ 66. White did not receive a pay increase and does not know if other employees working the fire command station at BJKNTC received a raise. *Id.* White was not aware of any open positions within the company and never applied for any other position with Andy Frain. *Id.* ¶ 68.

6. *Harassment and Comments*

a. *Emeris Lacen*

White alleges that Emeris Lacen, a female subordinate, harassed and discriminated against him on a number of occasions. White Aff. Ex. 19, White Dep. 150:15-151:24. He claims that in January 2011 Lacen harassed him after she "burned out the computer for fire command" and "flew off in a tangent" when White "accused her of not being able to do her job correctly." Marino Decl. Ex. 2, White Dep. 150:18-21. White also believes that Lacen harassed and discriminated against him in May 2011 when she accused him of sexual assault, sexual harassment, and favoritism. *Id.* 150:22-25. White thinks that she may have harassed

and/or discriminated against him again in August 2011 but he does not specifically remember the incident. *Id.* 151:2-4.

### b. *Edmond Quick*

White alleges that Edmond Quick, one of his supervisors, would sometimes not answer his phone calls when White was calling to be relieved from an extra shift. Marino Decl. Ex. 2, White Dep. 150:18-21. White also believes that Quick was involved somehow in removing White's scheduling responsibilities and in not promptly paying White the correct amount in many pay periods. *Id.* 167:4-11. White stated, however, that he was never harassed by Quick and considers him to be a "[t]otal gentleman." *Id.* 167:5-11, 383:11.

### c. *Dane DeSouza*

White claims that DeSouza made several discriminatory and harassing comments towards him. The first was in 2010; when White requested that his vacation time coincide with Passover, DeSouza allegedly commented something along the lines of "Why do black people associate with Jews," *id.* 171:15-23, or possibly "How come you black and you observe Passover? Isn't that only for Jews?" *Id.* 291:19-292:4. DeSouza made a second comment at some point in 2010, shortly after asking White to train a new employee. Def. Rule 56.1 Statement ¶ 51(b). White remembers DeSouza using the word "Jews" in a sentence but does not remember how it came up. *Id.* Third, in April 2011, when White requested that his vacation coincide with Passover, he claims that DeSouza made the following joke: "What do you call someone who is black and Jewish? A. Bluish." *Id.* ¶ 51(c).

Last, according to White, in May 2011, soon after Lacen had accused White of sexual harassment, DeSouza told White that Lacen had just been joking about the accusation and asked White: "Why aren't you touching Emeris's ass and why don't you have a sense of humor?

6

Jamaicans, black Jamaicans, don't you have a sense of humor? And towards Ms. Johnson [another female coworker], why are you touching [her] and not touching Emeris?" Marino Decl. Ex. 2, White Dep. 204:5-10.

7. *Retaliation*

Deidre Johnson, another Andy Frain employee, filed a claim of discrimination against Andy Frain with the Equal Employment Opportunity Commission ("EEOC") on September 12, 2011. White Aff. Ex. 31, Johnson EEOC Charge. White made a statement in support of her claim sometime shortly after the claim was filed. Marino Decl. Ex. 2, White Dep. 242:8-10. After White made the statement in support of Johnson's discrimination claim, DeCosta submitted an affidavit to the EEOC in relation to Johnson's claim that stated, in part, that DeCosta and DeSouza "have had concerns about Hartley's decision-making as a supervisor. Those concerns have been shared with BJKNTC, but they are adamant that Hartley is important to them in his current role." White Aff. Ex. 21, DeCosta Aff. ¶ 8.

B. *Procedural History*

White filed a charge of discrimination with the EEOC on May 25, 2012. White Rule 56.1 Response ¶ 15; Marino Decl. Ex. 1, at 11. The Notice of Right to Sue was issued by the EEOC on September 10, 2012, Marino Decl. Ex. 1, at 10, and White brought this action on November 28, 2012. Defendant moved for summary judgment on May 2, 2014. I heard oral argument on July 11, 2014.

## DISCUSSION

A. *The Summary Judgment Standard of Review*

A party is entitled to summary judgment upon a showing "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a). A fact is "material" if its resolution "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether material facts are in dispute, all ambiguities are resolved and all inferences are drawn in favor of the non-moving party. *See Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998). The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact. *Adams v. Dep't of Juvenile Justice of City of New York*, 143 F.3d 61, 65 (2d Cir. 1998). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . [or] showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). Because "[c]onclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact," *Kerzer*, 156 F.3d at 400, the non-moving party cannot survive a properly supported motion for summary judgment by resting on the pleadings "without offering 'any significant probative evidence tending to support the complaint.'" *Anderson*, 477 U.S. at 249 (quoting *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968)).

Because White is proceeding *pro se*, I read his pleadings "liberally and interpret them to raise the strongest arguments that they suggest." *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999) (citation and internal quotation marks omitted). However, the "application of this different standard does not relieve plaintiff of his duty to meet the requirements necessary to

8

defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003) (internal quotation marks omitted).

B. *The Title VII Claims*

1. *Discrimination*

White claims that he was discriminated against in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.*, which provides, in pertinent part that "[i]t shall be an unlawful employment practice for an employer (1) to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

In the absence of direct evidence of discrimination, a plaintiff in an employment discrimination case usually relies upon the three-step test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). Under the *McDonnell Douglas* framework, the burden to persuade the trier of fact "that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). However, the burden of production shifts as follows:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Id.* at 252-53 (quoting *McDonnell Douglas*, 411 U.S. at 802 (citation omitted)). Thus, a court must enter summary judgment for a defendant if the plaintiff (1) fails to put forth a prima facie case or (2) fails to present legally sufficient evidence contradicting a well-presented legitimate

9

reason, offered by the defendant, for the adverse employment action. *See Miles v. City of New York*, No. 99-CV-7365, 2002 WL 31410346, at *3 (E.D.N.Y. Oct. 24, 2002).

    a. *The Prima Facie Case*

To establish a prima facie case of discrimination a plaintiff must demonstrate that (1) he belongs to a protected class; (2) his job performance was satisfactory; (3) he suffered an adverse employment action; and (4) circumstances surrounding the employment action give rise to an inference of discrimination. *See Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000).

Andy Frain does not dispute that White belongs to a protected class or that his job performance was satisfactory, but asserts that White did not suffer any adverse employment action, and even if he did, that the circumstances surrounding such an action do not give rise to an inference of discrimination. I agree, and conclude that White has failed to establish a prima facie case of discrimination.

"A plaintiff sustains an adverse employment action if he or she endures a 'materially adverse change' in the terms and conditions of employment." *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (quoting *Richardson v. New York State Dep't of Corr. Serv.*, 180 F.3d 426, 446 (2d Cir.1999)). The adverse change must be more than "a mere inconvenience or an alteration of job responsibilities . . . [and] might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." *Id.* (quoting *Crady v. Liberty Nat. Bank & Trust Co. of Ind.*, 993 F.2d 132, 136 (7th Cir. 1993)) (internal citation omitted). The key inquiry is whether the employer's action is "tantamount to a demotion." *Patrolmen's Benevolent Ass'n*

*v. City of N.Y.*, 74 F. Supp. 2d 321, 335 (S.D.N.Y. 1999); *see also Lorenzo v. St. Luke's-Roosevelt Hosp. Ctr.*, 837 F. Supp. 2d 53, 65 (E.D.N.Y. 2011) (same).

The fourth element of a prima facie case – a showing that the circumstances surrounding the employment action give rise to an inference of discrimination – can be established in a variety of ways depending on the specific facts of the case. *See Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001); *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996) ("[T]he fourth element set forth in *McDonnell Douglas* is a flexible one that can be satisfied differently in differing factual scenarios."). Title VII plaintiffs often establish an inference of discrimination by showing that they were treated differently from other similarly situated employees, *Abdu-Brisson*, 239 F.3d at 468, or by adducing evidence of "actions or remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus." *Chertkova*, 92 F.3d 81 at 91 (citing *Ostrowski v. Atlantic Mut. Ins. Cos.*, 968 F.2d 171, 182 (2d Cir. 1992)).

b. *Analysis*

Several of the incidents that White complains of are mere inconveniences that do not constitute adverse employment actions. The denials of White's requests for his week-long vacation to coincide with the Passover holiday in 2010 and 2011 are not materially adverse changes in the terms and conditions of his employment, *Boyd v. Presbyterian Hosp. in the City of N.Y.*, 160 F. Supp. 2d 522, 537 (S.D.N.Y. 2001) ("The particular timing of a vacation is not so disruptive that it crosses the line from 'mere inconvenience' to 'materially adverse' employment action."); *Figueroa v. N.Y. Health & Hosp. Corp.*, 500 F. Supp. 2d 224, 230 (S.D.N.Y. 2007) (same), and neither is the alleged delay of several weeks in receiving payment for his time off in May 2011. *Badrinauth v. Touro Coll.*, No. 97-CV-3554, 1999 WL 1288956, at *6 (E.D.N.Y.

Nov. 4, 1999) ("A delay in the receipt of a paycheck is not an adverse employment action."). Similarly, White's claim that he was denied a discretionary raise is also not an adverse employment action. *See Maclin v. SBC Ameritech*, 520 F.3d 781, 788 (7th Cir. 2008) (the loss of a discretionary bonus or raise is not adverse employment action); *Sethi v. Narod*, No. 11-CV-2511, 2014 WL 1343069, at *19 (E.D.N.Y. Apr. 2, 2014) (finding no adverse employment action where "Plaintiff has not shown that he was entitled to, and denied, annual raises").

Whether White's claim that he was threatened with termination if he refused to cover extra shifts when other employees did not show up as scheduled constitutes an adverse employment action is a closer call. *Compare Aspilaire v. Wyeth Pharm., Inc.*, 612 F. Supp. 2d 289, 304 (S.D.N.Y. 2009) (assignment to work double shifts does not constitute adverse employment action) *with Dickerson v. SecTek, Inc.*, 238 F. Supp. 2d 66, 76-77 (D.D.C. 2002) ("An employer's unforeseen mandate that an employee work overtime whenever the employer requires it could affect the terms, conditions, or *privileges* of employment and thus could be described as adverse employment action." (internal quotation marks and citation omitted, emphasis in original)); *and Kang v. U. Lim Am., Inc.*, 296 F.3d 810, 818-19 (9th Cir. 2002) (Title VII claims of disparate treatment based on "discriminatory overtime" survive summary judgment). However, even assuming that being required to cover shifts when another employee fails to show up does rise to the level of an adverse employment action, White has failed to establish an inference that this action was undertaken with discriminatory intent. To the contrary, as noted above, White admits that other Andy Frain employees were required to work a double shift if their replacement did not report for duty as scheduled, Def. Rule 56.1 Statement ¶ 85, and that it was a "general order of the post" that if a fire or security guard leaves their post unattended they would be fired. Marino Decl. Ex. 2, White Dep. 166:2-7, 259:24-260:12; *see*

*also Dickerson*, 238 F. Supp. 2d at 76-77 (granting summary judgment against claim of discriminatory overtime assignments where the plaintiff had not presented evidence that similarly situated employees not belonging to plaintiff's protected class were treated differently).

White's allegations of being underpaid during certain pay periods might rise to the level of an adverse employment action, *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 791 (7th Cir. 2007) (underpayment for completed work is adverse employment action); *Greaves v. St. Luke's/Roosevelt Hosp. Ctr.*, No. 03-CV-7424, 2005 WL 627635, at *5 (S.D.N.Y. Mar. 17, 2005) (underpayment of wages "might constitute" adverse employment action), but again, there is not sufficient evidence to establish an inference of discriminatory intent. White has not adduced evidence that similarly situated employees not belonging to White's protected classes were treated differently. In fact, the evidence shows that many other Andy Frain employees had similar payroll issues, including regularly being underpaid. Def. Rule 56.1 Statement ¶ 104.

The three isolated comments that White alleges DeSouza made over the course of about a year and a half about blacks, Jews, and Jamaicans, though plainly inappropriate, are too attenuated from any potential adverse employment action to create an inference of discriminatory animus. *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 56 (2d Cir. 1998) ("[S]tray remarks, even if made by a decisionmaker, do not constitute sufficient evidence to make out a case of employment discrimination."); *Gordon v. Health & Hospitals Corp.*, No. 06-CV-1517, 2008 WL 924756, at *8 (E.D.N.Y. Mar. 31, 2008), *aff'd*, 350 F. App'x 547 (2d Cir. 2009) (same). White has failed to show a plausible nexus between these remarks and any adverse employment action. *See Adams v. Master Carvers of Jamestown, Ltd.*, 91 F. App'x 718, 722-23 (2d Cir. 2004) (summary order) ("In order for the remarks to be deemed significant, the plaintiff must show their nexus to the adverse employment decision.").

It is also unclear whether White's claim that his scheduling duties were taken away in May 2011 could constitute an adverse employment action. The bulk of White's testimony indicates that he generally had little to do with scheduling, Marino Decl. Ex. 2, White Dep. 79:18-19 ("I had very little involvement in the schedules."), in which case the removal of these duties would not rise to the level of an adverse employment action. Again, however, even assuming that this rose to the level of an adverse employment action, White has failed to create a plausible inference of discriminatory intent. Beyond the stray comments by DeSouza discussed above, White has not adduced evidence supporting such an inference and the record is clear that just before his scheduling duties were removed, a subordinate had complained that he was exhibiting favoritism towards another employee in whatever role he had in drawing up the schedules. *Id.* 141:20-24.

In sum, White has failed to make out a prima facie case of discrimination and defendant's motion for summary judgment on White's Title VII discrimination claims is granted.[1]

2. *Retaliation*

Title VII also prohibits an employer from discriminating against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). The same familiar *McDonnell Douglas* burden shifting framework applies to retaliation claims brought under this section. *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010). To establish a prima facie case of retaliation, an employee must demonstrate that (1) he participated

---

[1] Defendant also argues that many of White's discrimination claims are time-barred and/or unexhausted. Because I grant their motion for summary judgment on the grounds stated above I do not reach these arguments.

14

in a protected activity known to defendant; (2) he suffered an adverse employment action; and (3) a causal connection exists between the protected activity and the adverse employment action. *See Terry v. Ashcroft*, 336 F.3d 128, 141 (2d Cir. 2003) (quoting *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir. 1998)).

Andy Frain does not dispute that White's statement in support of Johnson's charge of discrimination is protected activity and that this activity was known to the company; it contends that White fails in establishing the second and third elements of the prima facie case.[2]

The majority of the incidents that White complains of occurred before he submitted his statement in support of Johnson's claim in or around September 2011 and thus could not be related to his participation in protected activity. White bases his retaliation claim on a conversation between either DeSouza or DeCosta and the representatives of defendant's client, BJKNTC, in which DeSouza or DeCosta called into question White's decision making as a supervisor.[3] Def. Rule 56.1 Statement ¶¶ 72-73; Marino Decl. Ex. 2, White Dep. 273:11-21.

The "standard for an adverse employment action in retaliation claims is considerably broader than the standard for discrimination claims under Title VII." *Vaughn v. City of N.Y.*, No. 06-CV-6547, 2010 WL 2076926, at *14 (E.D.N.Y. May 24, 2010) (citing *White*, 548 U.S. 53 (2006)). While a discrimination claim must demonstrate adverse actions affecting the terms and conditions of employment, a retaliation claim may be based on "employer actions that are likely to deter victims of discrimination from complaining to the EEOC, the courts, and employers." *White*, 548 U.S. at 68 (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997)). The Second Circuit has found that "negative evaluation letters, express

---

[2] White submitted his own EEOC charge after Andy Frain lost the contract for the BJKNTC and White was no longer in their employ. Thus, he does not allege any retaliation based on that protected activity.

[3] The timing of this conversation is disputed, for the purposes of deciding this motion I assume that it occurred sometime shortly after White made his statement in support of Johnson's discrimination charge.

15

accusations of lying, assignment of lunchroom duty, reduction of class preparation periods, failure to process teacher's insurance forms, transfer from library to classroom teaching as an alleged demotion, and assignment to [a] classroom on [the] fifth floor which aggravated teacher's physical disabilities" may qualify as adverse employment actions for purposes of a retaliation claim. *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 226 (2d Cir. 2006) (internal quotation marks and citations omitted). However, they have generally declined to extend that holding to include "[r]eprimands, threats of disciplinary action, and excessive scrutiny." *Lucenti v. Potter*, 432 F. Supp. 2d 347, 364 (S.D.N.Y. 2006); *Gentile v. Potter*, 509 F. Supp. 2d 221, 242 (E.D.N.Y. 2007).

Even under this more generous standard, I conclude that a conversation in which a supervisor merely raises potential concerns about an employee's performance with a client does not constitute an adverse employment action. Moreover, even assuming that this conversation did constitute an adverse employment action, Lacen's complaints against White for sexual assault, harassment, and favoritism provide a legitimate, nondiscriminatory reason for a supervisor to raise these concerns with the client. White has not shown this nondiscriminatory reason to be pretextual. *See Burdine*, 450 U.S. at 252-53. Accordingly, defendant's motion for summary judgment is granted on White's retaliation claim.

3. *Hostile Work Environment*

White's complaint, liberally construed, also asserts a hostile work environment claim under Title VII, which prohibits "a discriminatorily hostile or abusive [work] environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).

"In order to establish a hostile work environment claim under Title VII, a plaintiff must produce enough evidence to show that 'the workplace is permeated with discriminatory

16

intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Gorzynski*, 596 F.3d at 102 (quoting *Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir. 2006)). A plaintiff must show both that he subjectively found the environment to be abusive and, in addition, that the workplace was objectively abusive and hostile. *Id.* Unless an instance of abuse is particularly severe, the harassment must be "continuous and concerted" not merely "episodic." *Id.* (quoting *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002)).

White has not presented sufficient evidence from which a jury could infer that the defendants created a hostile work environment. The harassment and abuse that he alleges consists mainly of: (1) a few isolated remarks by a supervisor regarding White's race, religion, and nationality; (2) charges of sexual assault, sexual harassment, and favoritism lodged against White by Lacen, his subordinate; and (3) another supervisor sometimes refusing to answer his phone calls when White was trying to find a replacement to cover a shift. The perceived threats, discrimination, and harassment alleged by White do not come close to constituting the type of objectively hostile work environment that is severe or pervasive enough to alter the conditions of his employment. Defendant's motion for summary judgment on this claim is therefore granted.

C.  *White's Other Claims*

Claims brought under the ADEA and the NYSHRL receive the same analysis as claims under Title VII. *Raskin v. Wyatt Co.*, 125 F.3d 55, 60 (2d Cir. 1997); *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 913 (2d Cir. 1997). For the reasons stated above, I conclude that White has not established a prima facie case of discrimination under these statutes, accordingly, defendant's motion for summary judgment on the ADEA and NYSHRL claims is granted.

The Local Civil Rights Restoration Act of 2005, N.Y.C. Local Law No. 85 (the "Restoration Act"), requires that claims brought under the NYCHRL be evaluated separately from their federal and state law counterparts, such as Title VII and the NYSHRL. *See Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278-79 (2d Cir. 2009) (*citing Williams v. N.Y. City Hous. Auth.*, 872 N.Y.S.2d 27, 31 (N.Y. App. Div. 2009)). The NYCHRL explicitly requires an independent liberal analysis focused on fulfilling the NYCHRL's "uniquely broad and remedial purposes," which are more expansive than those of Title VII and the NYSHRL. *See id.* at 278 (quoting the Restoration Act); *Holness v. Nat'l Mobile Television, Inc.*, No. 09-CV-2601, 2011 WL 1085167, at *2 (E.D.N.Y. Mar. 21, 2011).

Mindful of the more liberal analysis required in assessing White's claim under the NYCHRL, I conclude that defendant's summary judgment should also be granted on this claim for the reasons stated above.

## CONCLUSION

For the reasons stated above, defendant's motion for summary judgment is granted on all claims.[4] The Clerk of the Court is respectfully directed to enter judgment accordingly and close the case.

So ordered.

John Gleeson, U.S.D.J.

Dated: August 8, 2014
      Brooklyn, New York

---

[4] Although White states in his complaint that he is asserting a claim for a violation of the Equal Pay Act, he does not allege (and there is no evidence) that he was paid less than similarly situated female employees. Summary judgment is therefore also granted on that claim.